680 So.2d 1309 (1996)
James Harper COX, Jr., et ux, Plaintiffs-Appellants,
v.
WILLIS-KNIGHTON MEDICAL CENTER, et al Defendants-Appellees.
No. 28,632-CA.
Court of Appeal of Louisiana, Second Circuit.
September 25, 1996.
Rehearing Denied October 24, 1996.
Nelson, Hammons & Self by John L. Hammons, Shreveport, for Plaintiffs-Appellants.
Rountree, Cox, Guin & Achee by Gordon E. Rountree, Shreveport, for Defendant-Appellee, Dr. James H. Phillips.
Charles G. Tutt, Shreveport, for Defendant-Appellee, Dr. Nancy J. Johnson.
Before NORRIS, WILLIAMS and CARAWAY, JJ.
CARAWAY, Judge.
In this wrongful death action, plaintiffs, James Harper Cox, Jr. and Elizabeth Ann *1310 Cox, appeal a judgment from a jury verdict which found no medical malpractice on the part of the defendant, Nancy J. Johnson, M.D., in the care and treatment of their son, Glenn William Cox. Glenn died in his home on August 18, 1990 from a self-inflicted gunshot wound while he was on a twelve-hour pass authorized by the defendant from Riverside Community Hospital, a chemical dependency unit directed by the defendant. For the reasons stated herein, we affirm.
The extensive medical record in this tragic case begins in January of 1984 when Glenn W. Cox, age 25, was admitted to Schumpert Medical Center by Dr. C.R. Teagle for psychiatric evaluation after complaining of severe insomnia and exhibiting signs of depression and anxiety. Glenn had seen Dr. S. Germaine Cassiere a few weeks earlier complaining of insomnia, weight loss, and occupational stress attributed to beginning private law practice. Dr. Cassiere prescribed Halcion and Xanax, but Glenn reported that these did not help him sleep. A psychiatric consultation by Dr. Richard Williams was obtained on January 31. Dr. Williams' impression was that Glenn suffered from "adjustment disorder with mixed emotional features and panic disorder." Dr. Williams recommended that Glenn be administered Xanax and Sinequan and ongoing outpatient treatment. Dr. Cassiere prescribed the medications recommended by Dr. Williams, but Glenn never followed up with Dr. Williams for treatment, although he apparently contacted Dr. Williams by telephone for prescription refills and was refused.
Some six and one-half years later, in June of 1990, Glenn again began to experience severe insomnia. He and his girlfriend, Kelly Elrod, had broken up around the first of June. Miss Elrod testified that she and Glenn had been dating since September of the previous year, shortly after she began working at the law firm where they both were employed. Miss Elrod further testified that during the period from September 1989 to late May of 1990, she and Glenn saw each other regularly on weekends and perhaps one night per week. She said that beginning around December, they began to have arguments as Glenn became increasingly volatile. Glenn drank heavily on weekends which increased his volatility to the point that it strained and ultimately led to the destruction of their relationship. She stated that she did not see him take any pills until the summer of 1990. In that regard, she said that Glenn told her he had been taking Valium in some prior years. Although they had "officially" broken up, Glenn and Kelly continued to see and communicate with each other through the summer.
On the weekend prior to July 4, Glenn and Kelly went out on Friday and Sunday. She was to start a new job at Willis-Knighton Medical Center the next week. He told her he would call her during the week to see how things were going, but he did not. On the evening of Wednesday, July 4, she telephoned to see how his holiday had gone because she had not heard from him. When he did not answer the telephone, she went over to his house. Although Glenn's car was there, he did not answer the door. She contacted Glenn's sister, Diane, who said the family had not heard from him. They became concerned after contacting a friend who said he failed to show up for a scheduled golf game. Ultimately, Glenn's father, who had a key to Glenn's house, went over to the house and found Glenn in a drug and alcohol induced stupor. Mr. Cox and Diane took Glenn to Schumpert Medical Center shortly before midnight.
At the Schumpert Emergency Room, Glenn complained that he was depressed and had not slept for the past month. He said the symptoms were worse that night. He had been taking Xanax all day and had consumed three beers in an effort to sleep. He also reported that he had been prescribed Prozac [apparently by Dr. Cassiere], but did not take them because of side effects. Dr. Cassiere's exchange was called at midnight, which directed the hospital to contact the psychiatrist on call, Dr. Richard Williams. Dr. Williams was contacted, and he requested that Glenn be admitted. After some discussion, Glenn was voluntarily admitted to the psychiatric unit of Schumpert shortly after midnight on July 5, 1990.
Glenn was not initially very cooperative with the staff of the unit attempting to assess *1311 his condition. A Department of Psychiatry record shows that Glenn denied his consent to have a photograph of him made at 12:45 a.m., and he also only partially completed other assessment forms complaining: "I do not need this. I'm here for sleeplessness, not for this."
The record pertaining to Glenn's stay at Schumpert contains Glenn's medical progress charts and reports by Dr. Dennis Nave and Dr. Williams. An initial psychiatric evaluation was performed by Dr. Nave on July 5. In his handwritten remarks in the progress chart, Dr. Nave noted that Glenn was admitted due to two weeks of no sleep, depressed mood and a fixation about a rash on his face. He took eight, 0.5 mg. Xanax tablets plus several Sominex in attempting to sleep on July 4. He described Glenn as alert and his affects as euthymic, although he described a marked depressed mood. He said Glenn had suicidal thoughts, no active interests, two weeks lack of sleep and loss of appetite for two weeks, 10 pound weight loss, no libido, and a marked fixation with the rash on his face. Dr. Nave noted no psychosis, no memory or organic impairment, and that Glenn was not suicidal at the time. Dr. Nave stated in his treatment plan that inasmuch as Glenn was unable to sleep on Xanax and had a trial with Sinequan and Prozac, he would start Glenn on a different tricyclic antidepressant, Norpramin.
On July 6, Glenn was interviewed by Dr. Williams. Dr. Williams noted that this was the second time he had seen Glenn, and noted that Glenn did not follow through with treatment in 1984"wanting meds only and not willing to change." He noted that Glenn apparently had been angry with him since that time. Dr. Williams further reported that Glenn had been depressed for three months with increasing sleep disturbance, decreasing appetite with decreasing energy, low self-esteem, but said he was not suicidal. He reports that Glenn had increased drinking over the past several years and had all the symptoms of middle-stage alcoholism. He had definite personality and mood change, mental obsession, loss of control, blackouts, and problems with his girlfriend. Apparently referring to Glenn's drinking, Dr. Williams noted that "he wants to cut back but not stop. He has [increased] in tolerance." Finally, Dr. William's noted that his impression was that Glenn was suffering from "Alcohol Dependencecontinuous; R/O (rule out) major depressive illnessrecurrent." At trial, Dr. Williams testified that he did not diagnose major depression in Glenn, but that it was a presumptive diagnosis until ruled out.
On July 6, Glenn requested and obtained approval from Dr. Nave to be discharged from the hospital. In his Discharge Diagnosis dictated on July 6, 1990, Dr. Nave stated that Glenn demonstrated symptoms which are consistent with major depression, recurrent type. He noted that Glenn had a somatic fixation on the rash on his right cheek which is over the concern which would normally be seen in such a state. He also noted that Glenn had a very rigid sort of personality style. His final diagnosis was "major depression, recurrent with somatic fixation." Dr. Nave prescribed anti-depressant medication, Norpramine, and Halcion for sleep. Glenn was to follow-up with him in two weeks for further psychotherapy.
Also notable in the Discharge Diagnosis is Dr. Nave's reference to Glenn's suicidality and possible alcoholism. He states:
As he is neither suicidal or homicidal or gravely disabled and we are looking toward the weekend, he has had no medical problems with side-effects from meds, I believe that it is now possible to let him go home. He is not now suicidal or is there evidence of any clear suicidal intent now or by his description of the last several days. He simply felt out of control the night where he was taking his medication and could not sleep. I have discussed with him issues that Dr. Williams has raised concerning the possibility that this man may be demonstrating early alcoholism. He and his father have discussed this matter with me and they have agreed that he will cease all alcohol use while under treatment for depression.
Glenn was discharged from Schumpert at 7:00 p.m. on Friday evening, July 6, 1990. Three days later, when he checked himself into Willis-Knighton Medical Center, Glenn *1312 would tell Dr. John N. Richie, "I managed to con my way out" of Schumpert.
According to a nursing admit note, Glenn walked into the behavioral medicine unit at Willis-Knighton on Monday, July 9, accompanied by Kelly Elrod. He was described as casually and neatly attired, clean shaven, with slight redness in his right eye. He was smiling, cooperative, giving clear and concise orders.
Glenn told the nurse that he was under much pressure from financial problems, family financial problems, the recent divorce of his sister and the recent break-up with his girlfriend. She also noted his obsession since June 19 with the facial blemish that was hardly noticeable.
Glenn reported to the nurse that since he was discharged from Schumpert on Friday, July 6, he had taken four Halcion tablets on Friday, eight on Saturday and Sunday night he had taken eighteen Halcion tablets and was also drinking. He refused hospitalization so the family had called the Shreveport Fire Department. He admitted to the nurse that he drank a lot on weekends and occasionally during the week. Glenn denied suicidal ideation, again claiming he only wanted to get some sleep.
Glenn stayed in the Behavioral Medicine Unit at Willis-Knighton for 13 days where he was placed on medication, psychotherapy and counseling from a treatment team that included psychiatrists, occupational therapists, social workers, nurses and counselors. Initially seen by Dr. John N. Richie, a psychiatrist who was filling in for Dr. James H. Phillips, who was on vacation, it was noted that Glenn reported a strong family history of alcoholism and that he described himself as a perfectionist. Dr. Richie's impression was that Glenn suffered from "Agitated Depression." He placed Glenn on medications and in daily individual psychotherapy, group therapy, occupational therapy and family therapy. Treatment was obtained regarding the cellulitis on his face. Glenn was placed on 15 minute checks because of his suicidal tendency, which was discontinued on Wednesday, July 11. Dr. Phillips took over on July 16.
Dr. Phillips recorded his diagnosis and treatment of Glenn while in the behavioral medicine unit in a summary dictated on September 9, 1990, some two months after Glenn was admitted to Willis-Knighton and three weeks after his death. The summary is largely repetitive, however, of Dr. Richie's and Dr. Phillips' contemporaneously written notes in the "multidisciplinary progress notes" regarding Glenn's history and progress while in treatment at the Willis-Knighton behavioral medicine unit. Glenn reported to Dr. Phillips that he had some crying spells, that he was easily agitated, that he drank heavily on weekends and was concerned about his amount of drinking. He admitted that his drinking had gotten out of hand on occasion and had been embarrassing to his girlfriend. It was part of the reason why they broke up, he said, but the primary reason was his abuse of sleeping pills. He said that the only reason that he was seeking treatment was because Kelly Elrod told him that if he did not get treatment, she would not even be his friend any more. He reported that on July 9 he had taken 14 of the Halcion tablets and drank three drinks in an effort to get sleep, although he knew it could kill him. Dr. Phillips placed Glenn on Prozac 20 mg. each morning and involved him in daily individual psychotherapy, group therapy, occupational therapy and family therapy. He was initially administered Desyrel 50 mg. at bedtime for sleep, but this was changed to Elavil 50 mg. along with his Prozac and Buspar three times per day.
Glenn's day to day progress regarding his mood, appearance, complaints, activities, counseling sessions, interaction with the treatment team, his family and other patients, his meal intake, sleep patterns, etc. are well charted in multidisciplinary progress notes in the Willis-Knighton medical record. These notes reflect that Glenn began to show significant improvement in participation in his therapies and was cooperative and appropriate in his behavior. He denied suicidal ideation. He requested and received a pass on Saturday, July 21 to leave the hospital from 3:30 to 8:30 p.m. and a pass for Sunday, July 22, from 9:00 a.m. to 7:00 p.m. He returned from his pass on Saturday in good condition. On Sunday, however, he was returned *1313 by his father who also brought a bottle of Halcion with only seven pills remaining in a prescription bottle of thirty filled just that day. While out on pass, Glenn apparently took twenty-three Halcion tablets. At this point he was discharged from the Behavioral Medicine Unit and admitted to the Medical Intensive Care Unit ("MICU") under the care of Dr. Haynie. The nurse's notes state that Glenn claimed he only took about ten Halcion, and that he was not trying to kill himself, but only wanted to get some rest.
At around 5:30 p.m. on Monday, July 23, 1990, Glenn was re-admitted to the Behavioral Medicine Unit. Glenn was placed on suicidal precaution with 15 minute checks. At 10:00 a.m. on July 24, a staff meeting was held regarding the treatment for Glenn. In attendance were 10 members of the treatment team who had worked with Glenn, including Dr. Phillips, Allison Byrd, B.C.S.W., Dr. Wolcott and others. The multidisciplinary progress chart notes reflect that the staff felt that Glenn was chemically dependent and recommended CDU (Chemical Dependency Unit) treatment. As stated in Dr. Phillips' discharge summary and trial testimony, it was decided that since Glenn was using denial excessively (regarding his alcohol and drug use), an intervention was necessary to confront him with his need for chemical dependency treatment. The only medication Glenn was given at this point was Tranxene 22.5 mg. the first night, 15 mg. the second night, and 7.5 mg. thereafter to be continued for a couple of weeks, apparently to aid in sleep. He was started on Anafranil 25 mg. daily and received it on July 24 and July 25 prior to discharge.
An intervention was held on July 25 in which Dr. Phillips, Glenn's father, Scott Jacobs, his best friend, Ron Weems, a close friend from work, and Dr. Kinnebrew, the director of the Riverside Community Hospital ("Riverside") chemical dependency unit ("CDU"), confronted Glenn with the chemical dependency problem. Glenn was told that if he did not get treatment, he stood to lose his job and friends. Glenn agreed to undergo voluntary treatment at the CDU.
At this point, we note that while Dr. Phillips and the treatment team decided to recommend that Glenn be treated at Riverside, Dr. Phillips' summary still lists in his discharge diagnosis, "Major DepressionRecurrent" as his first diagnosis and "Chemical Dependency (Benzodiazepine and Alcohol)" as his second diagnosis, both under the Axis I category. This discharge summary was dictated on September 9, 1990. By contrast, Dr. Phillips testified at trial that after the July 22 overdose, he believed that Glenn's primary problem was chemical dependency, namely alcohol and Benzodiazepines. The contemporaneous handwritten record reflects that he and the behavioral medicine unit staff had concluded on July 24 that Glenn should be sent for treatment to the chemical dependency unit at Riverside.
Glenn entered the CDU program at Riverside on July 26. On August 1, 1990, the CDU program at Riverside came under the management and control of Willis-Knighton. On that day, Dr. Nancy Johnson, who, like Dr. Kinnebrew, was not a psychiatrist, took over as director of the unit, replacing Dr. Kinnebrew, who had directed Glenn's care from July 26 to August 1. Dr. Johnson, a graduate of LSU Medical School in Shreveport, did her residency in anesthesiology at Baylor in Houston. She practiced anesthesiology at Willis-Knighton from 1983 until 1989. Suffering from chemical addictions herself in 1989, she underwent treatment and then studied addictionology under Dr. Richard Williams. Prior to becoming the director of Riverside, she worked at Brentwood for approximately one year.
Glenn gave Dr. Kinnebrew essentially the same history as has been narrated thus far. Additionally, however, Glenn admitted to Dr. Kinnebrew that he drank about a case of beer or more on weekends and sometimes drank during the week. He stated that this drinking pattern had existed for some time. Glenn's last drink was on July 8, 1990. Glenn denied any other drug use other than abusing alcohol and the recent overdoses of Benzodiazepines. When asked if he was suicidal, Glenn stated that at this point he felt that suicide was an option, but he agreed to sign a stay-alive contract and talk to a staff *1314 member before acting on any ideas. Dr. Kinnebrew's impression of Glenn's illness was:
1. Chemical Dependencyprimarily Alcoholism
2. Depression probably 2° to # 1.[1]
3. Acne
Glenn's treatment plan, which was scheduled to last 28 days (until approximately August 22) was listed by Dr. Kinnebrew as follows:
1. Observation
2. Stay-Alive Contract. Will obtain a psych consult by Dr. Phillips if this patient's depression continues or his suicidal ideas continue.[2]
3. Chemical Dependency Rehabilitation
4. Will continue patient's topical treatment for acne as prescribed by Dr. Laura Haynie.
The record indicates that Glenn was monitored closely over the next several weeks. Glenn remained on suicide watch and was monitored every half hour until August 6. Observations by the staff treatment team of Glenn's behavior while he was in the chemical dependency unit, including his moods, complaints, significant comments, physical appearance and other matters of medical significance are well-documented. These records indicate that Glenn had mood shifts, some sleeping disturbance, suicidal ideation at times, anger, sadness, and feelings of hopelessness. At the same time these records indicate an improvement in Glenn's depression, generally good sleep, favorable participation in therapies and activities. The medical record also contains documentation of various interviews with Glenn and his family along with assessments of Glenn's chemical dependency and depression. According to a chemical dependency profile, Glenn scored a 99 on a level of use assessment that rates a score over 50 in the category of addiction. Glenn also took a self-administered assessment test of his level of depression known as the Beck Depression Inventory ("BDI") and scored a 27, indicating moderate depression.[3] Perhaps the only constants in the documented record are notations that Glenn never believed he was an alcoholic and that he was angry and wanted to get out of the CDU treatment facility, although his efforts in this latter regard subsided as he neared the end of his treatment.
Of particular importance in the record of medications is the discontinued administration of antidepressant drug therapy while Glenn was in the chemical dependency unit. Prior to his admission to Riverside, Glenn had been treated with various antidepressant medications both at Schumpert and Willis-Knighton as previously stated above. Though he testified at trial, Dr. Phillips never stated that he specifically mandated that antidepressant medication be continued at the CDU. All drug therapy was discontinued while Glenn was in CDU except for the administration of the drug Inderal, a beta-blocker type drug prescribed by Dr. Johnson when Glenn reported some sleep disturbance and anxiety on August 11. She reported slight improvement with the administration of that drug.
According to Dr. Johnson's case summary, beginning around August 15 Glenn expressed a desire to go home on a pass. She notes that on August 17 he had a positive visit with his girlfriend and appeared to be in touch with his feelings. He filled out a formal pass request and expressed appropriate feelings about his pass, namely, that he wanted to check on his house and get things ready for when he was to get out the next week. He was specifically probed for any suicidal ideation which he denied. According to Dr. Johnson, he was rational, oriented and not out of control, and the request for his pass was granted on these grounds for August 18.
At 10:00 a.m. on Saturday, August 18, Glenn's father picked up Glenn from Riverside. Glenn had apparently called Kelly Elrod *1315 immediately before then and tried to make arrangements to see her. She told him that she was moving her belongings into storage and that he was welcome to come over, but she could not do anything until that was completed.[4] Glenn rode to his parent's house with his father to get his car. He declined to go inside and visit with his mother, stating that he had a lot of things to do. Kelly spoke with Glenn again that afternoon around 3:00 p.m. and discussed getting together with Glenn that evening although there were no definite plans. Glenn's sister, Diane, also spoke with Glenn and unsuccessfully tried to get him to go to a movie with her and some friends. They made plans to go eat pizza about 7:00 p.m.
Between 5:00 to 5:30 Kelly and her sister stopped by Glenn's house and noticed that his car was there, but he did not answer the door. They suspected that Glenn was in the house because she could see his tennis shoes through a window. She tried to contact Glenn's sister, Diane, but she was gone. Ultimately, they drove to a nearby telephone and Kelly contacted Glenn's father about her concern. Having just returned home from a golf game, he told her he would change clothes and go check on Glenn.
At approximately 7:20, Glenn's mother and father went to Glenn's house and found Glenn lying on the bathroom floor face down in the fetal position. He appeared to be dead. Glenn's father contacted Riverside Hospital and told them that his son was dead, and that they should not have let him out. He demanded that Riverside contact the authorities. Riverside personnel contacted the police, who arrived at the house about 8:20. It was then discovered that Glenn had suffered a gunshot wound in the abdomen. After a protracted search, a .38 caliber pistol was found. Also, a receipt for the purchase of the pistol was found. Glenn had purchased the pistol that day from a pawn shop. The record does not indicate the time of purchase. A neighbor testified at trial that she heard a gunshot at approximately 6:30 p.m. The Coroner's report showed that Glenn died from the gunshot wound. On the certificate of death, the time of death was put at 7:40 p.m. The autopsy report, while indicating no signs of alcohol in Glenn's blood, did show signs of damage to the liver consistent with alcohol abuse.
Glenn's parents, Harper and Elizabeth Cox, filed a request for a medical review panel alleging medical malpractice on the part of Willis-Knighton, as owner of Riverside, Dr. James Phillips and Dr. Nancy Johnson. The complaint was that Willis-Knighton, Dr. Phillips and Dr. Johnson wrongly discontinued Glenn's treatment for major depression by discontinuing the administration of anti-depressant drugs and psychotherapy while he was in the CDU.
The medical review panel, consisting of Dr. Linda Boswell, Dr. Fran Nixon, and Dr. Andrew J. Mullen, all psychiatrists, found by a vote of 2-1 that there was no malpractice on the part of the hospital, Dr. Phillips or Dr. Johnson. The dissenting voter, Dr. Mullen, believed that, based upon the written medical records, Dr. Phillips was negligent in sending Glenn to a CDU with a diagnosis of major depressive disorder before the depression had resolved. He felt that, under a dual diagnosis of chemical dependency and major depression, Glenn could have obtained psychiatric care along with his chemical dependency treatment, if not in Shreveport, in other cities which house dual diagnosis centers to which a referral could have been made.
Plaintiffs subsequently filed suit on September 21, 1992 for wrongful death against Willis-Knighton Medical Center, Dr. James H. Phillips and Dr. Nancy Johnson. The claims against Willis-Knighton and Dr. Phillips, however, were subsequently dismissed. A trial by jury lasting one week beginning on January 23, 1995 was held in which both sides presented extensive expert testimony on the question of whether Dr. Johnson had breached the standard of care in her treatment of Glenn. On February 1, 1995, the jury returned a unanimous verdict of "no" to the following interrogatory:

*1316 Do you find by a preponderance of the evidence that Dr. Nancy Johnson failed to meet the standard of care required of her in her treatment of Mr. Cox?
Judgment in accordance with the verdict was filed by the trial court on March 14, 1995. Plaintiffs moved for a Judgment Notwithstanding the Verdict ("JNOV") and for a new trial. Both these motions were denied in a written opinion by the trial court dated June 30, 1995 and signed a judgment on August 16, 1995. In its written reasons for denying the plaintiffs' motion for JNOV, the trial court noted that "[t]here was conflicting evidence before the trier of fact (jury) concerning whether Dr. Johnson met the standard of care in her treatment of Glenn Cox. While the court may or may not have reached the same conclusion based on the evidence, the court cannot say that reasonable persons could not have reached the conclusion reached by the jury in this case." A similar reason was given for denial of plaintiffs' motion for a new trial.
Plaintiff now appeals alleging as the single assignment of error that the civil jury was manifestly erroneous in failing to conclude that the defendant, Dr. Nancy Johnson, deviated from applicable medical standards with regard to the care and treatment provided to the decedent, Glenn W. Cox. Plaintiffs contend that the medical record demonstrates Glenn Cox was suffering from major depression, or what is generally referred to medically as major depressive disorder. It is undisputed by any of the parties and their testifying experts that major depression is a distinct psychiatric illness. Major depression calls for a recognized treatment protocol, namely, the administration of antidepressants and psychotherapy. Plaintiffs contend that Dr. Johnson failed to recognize that Glenn suffered from major depression and to follow the proper treatment protocol by treatment with antidepressants and psychotherapy, and obtaining a psychiatric consult. Plaintiffs also contend that Dr. Johnson failed to follow her own treatment plan, that is, the treatment plan formulated by Dr. Kinnebrew and adopted by her on August 1, 1990 when she took over the CDU, which required that she get a psych consult in the event that Glenn's depression continued while he was undergoing treatment at the CDU. Finally, the plaintiffs contend that this alleged malpractice on the part of Dr. Johnson caused or contributed to Glenn's suicide or deprived him of a substantial chance of survival. Based upon expert testimony to the effect that 85 to 90 percent of patients suffering from major depression are successfully treated with antidepressants, plaintiffs submit that there was an 85 to 90 percent chance that Glenn would have survived the major depressive episode they contend led to his suicide.

Applicable Law
The plaintiff's burden of proof in a medical malpractice action against a physician is found in La. R.S. 9:2794(A) which provides:
"A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., a dentist licensed under R.S. 37:751 et seq., an optometrist licensed under R.S. 37:1041 et seq., or a chiropractic physician licensed under R.S. 37:2801 et seq., the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred."
*1317 In Martin v. East Jefferson General Hospital, 582 So.2d 1272, 1276 (La.1991), the Supreme Court outlined the burden of proof and appellate standard of review in such cases as follows:
"In a medical malpractice action against a physician, the plaintiff carries a two-fold burden of proof. The plaintiff must first establish by a preponderance of the evidence that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and the injury sustained. LSA-R.S. 9:2794; Smith v. State through DHHR, 523 So.2d 815, 819 (La.1988); Hastings v. Baton Rouge General Hospital, 498 So.2d 713, 723 (La.1986). Resolution of each of these inquires are determinations of fact which should not be reversed on appeal absent manifest error. Housley v. Cerise, 579 So.2d 973 (La.1991); Smith, 523 So.2d at 822; Rosell v. ESCO, 549 So.2d 840 (La.1989); Hastings, 498 So.2d at 720."
"[I]f the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). "We have instructed the appellate courts that where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d at 844; Housley, supra."
We also note that the law does not require perfection in medical diagnoses and treatment. On the contrary, a doctor's professional judgment and conduct must be evaluated in terms of reasonableness under the then existing circumstances, not in terms of results or in light of subsequent events. Broadway v. St. Paul Insurance Co., 582 So.2d 1368 (La.App. 2d Cir.1991), and the cases cited therein. When the alleged negligence of a specialist is at issue, only those qualified in that specialty may offer expert testimony and evidence of the applicable standard of care. Fox v. Our Lady of Lourdes Regional Medical Center, 550 So.2d 379 (La.App. 3rd Cir.1989), writs denied, 556 So.2d 1263 and 556 So.2d 1264 (La.1990). When the expert opinions contradict concerning compliance with the applicable standard of care, the trial court's conclusions on this issue will be granted great deference. It is the sole province of the factfinder to evaluate the credibility of such experts and their testimony. Arceneaux, supra; Broadway, supra.

Discussion
In the instant case, we have conducted a thorough review of the entire record, including the trial testimony, deposition testimony, and medical records submitted into evidence. Dr. Johnson testified that, as a physician, the standard of medical care requires that she recognize major depression in a patient. In her view, however, Glenn Cox was suffering from depression related to his chemical dependency and not major depression, which according to the testimony must be diagnosed independently of any organic mental disorder of the type induced by alcoholism. Thus, the central question is whether, based upon the medical record, Dr. Johnson failed to recognize major depression in Glenn Cox and thereby failed to obtain proper treatment for his illness.
Plaintiffs' expert witnesses, Dr. George Seiden, Dr. Richard Williams, and Dr. Doyle Carson all testified that Dr. Johnson breached the standard of care by failing to adequately recognize and treat the depression that was present in Glenn Cox. Dr. Seiden defined major depression as follows:
Major depression is a depressive illness of major proportions. There are a variety of depressive illnesses, some minor and some major. It's categorized as major when it meets certain criteria. It usually has a beginning and an end. You may not be able to sharply demonstrate the beginning because it kind of gradually builds up until it's at the severe levels that it reaches, and it consists of a variety of symptoms which can be very distressing, things that interfere with sleep, appetite, sex drive, energy, *1318 concentration. People who suffer from major depression lose interest in almost everything, they receive no pleasure from anything, they have trouble sleeping or sometimes sleep too much. Often there are increased thoughts of death or dying, sometimes increased thoughts of suicide, suicidal thoughts at various levels that we assess when we are looking at suicide. Sometimes it's just I would be better off dead or they would be better off if I were dead but nothing further. Sometimes it goes on to active thinking about how to do it, planning for it, making various arrangements for it and then attempting it. At times that's a part of major depression, not always.
Based upon his review of the record, Dr. Seiden believed that Glenn exhibited symptoms in the CDU of sadness and hopelessness that meet the criteria for major depression and that the major depression coexisted with the chemical dependency. Of particular interest to him was an entry in the medical record that Glenn stated his depression was worse in the morning. Dr. Seiden testified that this diurnal mood variation is also a hallmark of major depression.
Dr. Williams testified that the fact that Glenn was on suicide watch when Dr. Johnson took over Glenn's case is a sign of major depression. This is to say, Dr. Williams apparently believed that the continued suicidal ideation in Glenn, evidenced by the length of time he remained on suicide watch, indicated Glenn was suffering from major depression.
Finally, Dr. Doyle Carson testified that major depression, by definition, cannot be caused by chemical dependency. Depression, but not major depression, may be secondary to chemical dependency. In his view Glenn may have abused chemicals, but he was not chemically dependent. Focusing on Glenn's insomnia, Dr. Carson said that Glenn was depressed and desperate to get some sleep. He believed that the record of Glenn's insomnia, sadness, suicidal ideation, sleep disturbance and diurnal mood variation evidenced unmistakable symptoms of major depression.
Defendant's experts included staff members who actually worked with Glenn Cox. Allison Byrd, a certified social worker who worked in the behavioral medicine unit at Willis-Knighton while Glenn was there, testified regarding her notes in the record. She stated that the decision to send Glenn for chemical dependency treatment was unanimous and included Dr. Wolcott and Dr. Phillips. She said every member of the staff believed that Glenn's prevailing problem was chemical dependency.
John Holland, a certified substance abuse counselor who worked as Glenn's case manager while he was at the CDU, testified that Glenn was a typical patient in that he showed signs of depression. He believed that Glenn was a late-stage alcoholic and that the depression he exhibited was similar to the depression seen in other alcoholics undergoing withdrawal resulting from treatment in a CDU. He noted that Glenn was anxious and had sleep problems over his substance abuse problem and because Kelly Elrod was going to Chicago. He testified that on August 10, Glenn had said he wanted to "check out," a comment which Mr. Holland interpreted as referring to suicide. Nevertheless, five days thereafter having seen Glenn improving, Mr. Holland recommended that Glenn receive a pass because he believed that Glenn was past that stage, had been compliant with treatment and would be getting out within a few days after having been in treatment for five weeks. Finally, Mr. Holland testified that while Glenn was not treated for major depression, he was treated for depression through various therapies.
Dr. Linda Boswell, a member of the medical review panel, testified that based upon her review of the record, Glenn presented so many different character traits and symptoms that they could have been symptoms of depression or symptoms of withdrawal from chemical dependency. In her view, the symptoms of depression were not consistent enough to indicate any further treatment [for depression] than that provided by Dr. Johnson. Based upon her view of CDU records, at the time that Dr. Johnson granted the pass to Glenn, Dr. Boswell saw no necessity to call back in Dr. Phillips for a further psychiatric consult or for further treatment for depression. She said in a patient like *1319 Glenn, you almost always had to treat the chemical dependency before you could treat the depression. In her view, Glenn did not die as a result of medical treatment or the failure to obtain medical treatment.
Dr. Frances E. Nixon, also a member of the medical review panel and a former professor of psychiatry at LSU who is now the regional director of the state mental health care unit, testified that she believed that although Glenn exhibited some depressive symptoms, the record did not support a simple diagnosis of major depression because of the coexistence of alcoholism. She also testified that suicide is prevalent among chemical dependency patients and it is difficult to distinguish between depressive feelings, thoughts, and symptoms that are related to alcohol abuse and those related to the psychiatric disorder of major depression. She also stressed that a diagnosis of major depression requires that the symptoms of depression be present on a continuous day to day basis, and in Glenn's case, there were recorded notations of significant improvement in the depression leading up to August 18, indicating that the depression was lifting. The symptoms Glenn exhibited could have been withdrawal from chemicals.
Also testifying on behalf of Dr. Johnson were Dr. James B. Denny and Dr. Lewis Cataldie. Dr. Denny, a psychiatrist, pointed to the Diagnostic and Statistical Manual for Psychiatric Disorders III regarding its criteria for major depression, noting that the criteria for diagnosing major depression says "not due to any organic mental disorder or uncomplicated bereavement." He testified that "uncomplicated bereavement" refers to the death of a spouse or parent and things of that nature, while "organic disorder" would include alcohol induced depression. Dr. Denny said that alcoholics often seek treatment for depression because it is less humiliating than chemical dependency treatment. He believed that the reason Dr. Phillips initially diagnosed major depression was because Glenn downplayed his use of drugs and alcohol.
Dr. Cataldie specializes in addiction medicine. He stated that based upon his review of the record, there was no need to obtain a psych consult. He testified that many CDU patients come in with suicide ideation, and develop sleep problems during detoxification. In fact, he said that most patients run the gamut of emotions during the withdrawal from their chemical addiction such as sadness, anger, etc. He believes that Glenn suffered from alcohol dependency compounded by benzodiazepine dependency with symptoms of depression.
Both Dr. Johnson and Dr. Phillips testified. When questioned why his case summary written after Glenn's death had a primary discharge diagnosis of major depression, Dr. Phillips stated that it was not uncommon to put the discharge diagnosis the same as the initial, admitting diagnosis. He stated that at the time he was treating Glenn, he had come to the conclusion that Glenn was suffering from chemical dependency, and this was his primary problem, not major depression. He stated that the entire treatment team concurred in this view.
Dr. Johnson believed that Glenn was suffering solely from chemical dependency, and that his depression was secondary to chemical dependency. When questioned as to why she did not get a psychiatric consult when Glenn's depression and suicidal thoughts continued, as called for in the initial treatment plan formulated by Dr. Kinnebrew, she stated that she believed that Glenn was improving and that these symptoms were characteristic of detoxification from chemical dependency. She would have obtained a psych consult had she felt there was a need for one. As previously stated, she admitted that as an M.D., even though not a psychiatrist, her training as a physician required her to diagnose major depression in a patient.
Our thorough review of the actual medical record indicates that the testimony of all of the medical experts is well-supported in the record. It is only in their interpretations of this record of Glenn's complicated history that the experts differed.
Apart from the experts' conflicting opinions interpreting the medical record, the jury reviewed the chronology of events that were thoroughly detailed in this well-tried case. Throughout the seven week period leading up to the time of Glenn's death, the notes and records of the physicians and other caregivers, which, unlike the opinions rendered *1320 after this tragic death, were contemporaneously chronicled, demonstrate various diagnoses of the depressive illness. The psychiatrists who attended Glenn prior to his going to CDU never clearly ruled out major depression, yet never clearly set their course of treatment aimed totally at major depression with a month or more of anti-depressants and psychotherapy. It is significant that three separate medical units (Schumpert, Willis-Knighton and Riverside), under the orders of three different physicians, released Glenn from their institutions under the belief that such freedom was medically justified. On each of the three occasions, Glenn immediately acted in a manner that could lead to his death. While this recurrence of events can be weighed for the plaintiffs' case, it might also be viewed for the defense as evidencing the consistent, difficulty experienced by the medical community in helping this patient. Finally, the testimony of Mr. Holland and Dr. Johnson regarding the changes which they observed in Glenn in the days immediately leading up to his release, including improvement exhibited by his clearer thinking, relations with others at the CDU and weight gain, were likewise noted in the contemporaneous medical record and could be weighed by the jury based upon their own experiences apart from the conflicting experts' testimony.
In this difficult case, we must repeat our statement of the law regarding appellate review. While we might differ in our conclusions regarding the medical treatment provided by Dr. Johnson, the jury's verdict must be affirmed when its view of her actions is reasonably supported by the record. Accordingly, finding that the verdict is not clearly wrong or manifestly erroneous, we affirm. Costs are assessed to appellants.
AFFIRMED.

APPLICATION FOR REHEARING
Before HIGHTOWER, BROWN, WILLIAMS, STEWART and CARAWAY, JJ.
Rehearing denied.
NOTES
[1] Testimony indicates that this means that the depression was probably secondary to number 1, i.e., the chemical dependency.
[2] In his handwritten progress record, Dr. Kinnebrew stated "psych consult if depression continues" only, leaving off mention of suicidal ideation as in his typewritten report quoted above.
[3] By some expert accounts, this is "moderate to severe" depression.
[4] Kelly testified that she was moving to Chicago the next day to begin a new job and had to have her furniture out of her apartment and in the storage by 5:00 p.m. that day.