697 So.2d 688 (1997)
Angelia SIMMONS Plaintiff-Appellant,
v.
Dr. Warren C. WEST Defendant-Appellee.
No. 29,633-CA.
Court of Appeal of Louisiana, Second Circuit.
June 18, 1997.
Rehearing Denied August 14, 1997.
*689 Edmund M. Thomas, Amy-Elizabeth Temple Brainard, Shreveport, for Plaintiff-Appellant.
Cook, Yancey, King & Galloway by Hershel E. Richard, Jr. Shreveport, for Defendant-Appellee.
Before MARVIN, NORRIS and WILLIAMS, JJ.
WILLIAMS, Judge.
In this medical malpractice action, the plaintiffs, Angelia and Gregory Simmons, appeal a judgment in favor of the defendants, Dr. Warren West and Dr. Oscar Berry. The trial court found that defendants had not breached the applicable standard of care and were not liable for plaintiffs' injuries. For the following reasons, we affirm.

FACTS
On November 17, 1987, the plaintiff, Angelia Simmons, saw Dr. Warren West and reported that her pregnancy test was positive and that she had observed "spotting" of blood for approximately two weeks. Dr. West's impression was that Simmons was carrying an intrauterine pregnancy and was at risk of aborting. He recommended bed rest and told her to return in two weeks. On December 3, 1987, Simmons returned to Dr. West and reported an episode of spotting on November 29 and slight left side pain on November 30, 1987. The plaintiff's physical exam was normal and Dr. West recommended that she have an ultrasound.
The next day, December 4, 1987, Dr. John Marshall, a radiologist, performed an abdominal ultrasound, which did not indicate the presence of a fetus. While viewing the sonogram, Simmons asked whether a spot could be a tubal pregnancy, but Dr. Marshall said the object was a cyst on her ovary. Dr. Marshall telephoned Dr. West and verbally reported the results of the ultrasound. In his notes of the conversation, Dr. West wrote there was no fetus, there was a "sac seen" and a slightly enlarged uterus. Later that day, Dr. West told Simmons that he thought she had lost the pregnancy since the sonogram did not show a fetus in her uterus. Dr. West suggested that she return the following week for a dilation and curettage ("D & C") procedure to remove any remaining fetal tissue from the uterus.
*690 On Sunday, December 6, 1987, Simmons experienced vaginal bleeding, cramping and was "doubled over" with abdominal pain. The next morning she was seen by Dr. Oscar Berry because Dr. West was not in the office. Dr. Berry examined Simmons and found a slightly enlarged uterus, a closed cervix and slight bleeding. He did not detect any masses in Simmons' adnexa, which consists of the fallopian tubes and ovaries. Dr. Berry admitted her to the hospital and performed the D & C procedure, which involves scraping the inner lining of the uterus to remove any tissue remaining from a pregnancy. Dr. Berry discharged Simmons and advised her to contact him or Dr. West if she had any further pain or bleeding.
Simmons did not report any such symptoms during the next thirty days. She spoke with Dr. West one week after the D & C, said that she felt fine and requested a letter authorizing her return to work. On January 4, 1988, Simmons saw Dr. West for a post-D & C examination. At the time, she did not complain of bleeding, cramping or abdominal pain. Dr. West, who was wearing a wrist stabilizer for a fractured bone, performed a bi-manual pelvic exam. He did not feel any adnexal masses and reported the exam as normal.
One week later, Simmons experienced hypervolemic shock and collapsed while working at Humana Hospital. An ultrasound showed an ectopic pregnancy with a fetal heartbeat in the right fallopian tube. Dr. Wayne Sessions performed emergency surgery and removed the fallopian tube, which was damaged as a result of the ruptured ectopic pregnancy. Simmons remained hospitalized for one week following surgery and has been treated by a psychiatrist for post-traumatic stress disorder.
In July 1990, a medical review panel was convened after plaintiffs filed a complaint alleging that the treatment provided by Dr. West and Dr. Berry fell below the standard of care. The panel members unanimously found that Dr. West and Dr. Berry had not breached the applicable standard of care, and that their conduct did not cause the plaintiffs' injuries. Subsequently, the plaintiffs filed this action for damages alleging that the defendants' negligence caused their injuries.
The trial judge heard seven days of testimony during December 1995 and January 1996. Following the close of evidence, the parties submitted proposed findings of fact and conclusions of law. The trial court rendered judgment in favor of the defendants, finding that Simmons had an intrauterine pregnancy which spontaneously aborted and that a separate ectopic pregnancy later ruptured and caused plaintiffs' injuries. The trial court further found that defendants met the applicable standard of care and were not liable for damages in failing to diagnose the second pregnancy. The plaintiffs appeal.

DISCUSSION

Standard of Care
The plaintiffs contend the trial court erred in defining the applicable standard of care. They argue that the exercise of medical judgment required the defendants to use available diagnostic tests to rule out ectopic pregnancy as a potential cause of the patient's symptoms.
In a malpractice action based on the negligence of a physician licensed to practice in Louisiana, where the defendant practices in a particular specialty and the alleged acts of medical negligence raise issues peculiar to that specialty, the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians within that medical specialty. LSA-R.S. 9:2794 A; Roberts v. Cox, 28,094 (La.App.2d Cir. 2/28/96), 669 So.2d 633. When the alleged negligence of a specialist is at issue, only those qualified in that specialty may offer expert testimony and evidence of the applicable standard of care. Cox v. Willis-Knighton Medical Center, 28, 632 (La.App.2d Cir. 9/25/96), 680 So.2d 1309.
In the present case, the three members of the medical review panel were accepted as experts in obstetrics and gynecology and they testified regarding the standard of care. Dr. James Miciotto stated that a physician's clinical experience and judgment are as important as tests in making a diagnosis and choosing treatment. Dr. Tandy McElwee testified that an obstetrician's selection of *691 diagnostic tests involves the exercise of his clinical judgment in light of the patient's symptoms. In addition, Dr. James Boyd agreed that a physician uses clinical judgment in evaluating a patient based on the symptoms presented and the other information available.
This expert testimony supports the trial court's finding that the standard of care during the relevant time period required the obstetrician to use sound clinical judgment based on the symptoms presented. The trial court's expression of the standard is consistent with the statutory requirement that defendants exercise reasonable care along with their best judgment in the application of the requisite degree of skill. See LSA-R.S. 9:2794 A(2). The assignment of error lacks merit.

Negligence
The plaintiffs contend the trial court was clearly wrong in finding that the defendants were not negligent in their treatment of Angelia Simmons. They argue that Dr. West and Dr. Berry deviated from the standard of care by neglecting to administer additional tests and in failing to diagnose an ectopic pregnancy.
In a medical malpractice action against a physician, the plaintiff must first establish by a preponderance of the evidence that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and the injury sustained. Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991); Roberts v. Cox, supra. Credibility determinations, including the evaluation of expert testimony, together with the ultimate issue of whether a plaintiff has satisfied his burden of proof are factual issues to be resolved by the trier of fact and will not be disturbed on appeal in the absence of manifest error. Martin v. East Jefferson General Hospital, supra; Roberts v. Cox, supra.
In the present case, the plaintiffs contend the trial court was clearly wrong in finding that Angelia Simmons was carrying an intrauterine pregnancy which was separate from the six-week ectopic pregnancy which ruptured. Plaintiffs' expert obstetricians, Dr. Jeffrey Koren and Dr. James O'Leary, opined that a second pregnancy was physiologically impossible in these circumstances.
However, Dr. McElwee testified that Angelia Simmons could have begun ovulation as her intrauterine pregnancy ended and her hormone levels dropped in November 1987. The fertilized egg then lodged in her fallopian tube, but was too small to be detected by the abdominal ultrasound. Another expert obstetrician-gynecologist, Dr. Susan Shattuck, testified that in rare cases a patient can simultaneously carry a tubal and an intrauterine pregnancy.
The record contains evidence which the trial court could reasonably have considered to be consistent with an aborted intrauterine pregnancy, including the apparent remnant of a chorionic sac inside the uterus visible on the sonogram, Simmons' vaginal bleeding and abdominal pain on December 6, 1987, indicating expulsion of matter from her uterus and the lack of symptoms exhibited by Simmons following the D & C procedure. Considering the evidence and testimony contained in the record, we cannot say the trial court was clearly wrong in finding that Angelia Simmons carried an intrauterine pregnancy that miscarried and a subsequent ectopic pregnancy which ruptured in January 1988.
Plaintiffs argue that even if two pregnancies existed, the trial court was manifestly erroneous in finding that defendants were relieved of their duty to diagnose a six-week ectopic pregnancy. They urge that the basic rules of medicine required defendants to administer available diagnostic tests to rule out a possible ectopic pregnancy. One such test measures the level of human chorionic gonadotropin (hCG), a hormone produced in pregnancy, contained in the blood.
A physician is not held to a standard of absolute precision. Rather, his conduct and judgment are evaluated in terms of reasonableness under then-existing circumstances, not on the basis of hindsight or in light of subsequent events. Iseah v. E.A. Conway Memorial Hospital, 591 So.2d 767 (La.App. 2d Cir.1991), writ denied, 595 So.2d *692 657 (La.1992). The mere fact that an injury occurred does not raise a presumption that the physician was negligent. LSA-R.S. 9:2794 C.
Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Martin v. East Jefferson General Hospital, supra. If the trial court's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990); Cox v. Willis-Knighton Medical Center, supra.
Dr. Koren testified that the defendants deviated from the standard of care by failing to run serial quantitative beta hCG tests when the patient had a history of spotting early in the pregnancy. However, Dr. Koren acknowledged that in his practice, he had not ordered hCG tests every time a patient presented with such spotting, but had exercised his clinical judgment in each situation. Dr. O'Leary, who testified by deposition, opined that the standard of care in 1987 required Dr. West and Dr. Berry to rule out a possible ectopic pregnancy with the use of serial quantitative hCG tests or with urine pregnancy tests after the D & C recovered decidua tissue without the products of conception.
In contrast, Dr. Miciotto testified that in 1987 the standard of care did not require use of serial quantitative hCG tests in diagnosing an ectopic pregnancy. He acknowledged that a urine pregnancy test could have been used after the D & C to confirm a miscarriage. However, he stated that because a urine test could be positive for two weeks following an aborted pregnancy, it was a judgment call for the treating physician in deciding whether to administer the test under circumstances where the patient had not reported any symptoms of pain for two to three weeks and a pelvic exam had not detected a mass in her adnexa.
Dr. McElwee opined that there were two pregnancies involved and that the defendants had not deviated from the standard of care in failing to diagnose the tubal pregnancy after the miscarriage. Dr. McElwee stated that in light of the patient's lack of symptoms between December 14, 1987 and January 4, 1988, it was reasonable for Dr. West to assume that Simmons' problem had been resolved.
In addition, Dr. Boyd testified that abdominal pain is the most reliable symptom of ectopic pregnancy, and thus a physician's index of suspicion for a tubal pregnancy would be very low with a patient who did not complain of pain for over a month. If he had been faced with a similar situation in 1987, Dr. Boyd stated that he would not have done a pregnancy test, but would have instructed the patient to report any pain or other symptoms and proceed from there. Dr. Boyd opined that Dr. West and Dr. Berry had not deviated from the standard of care in making a treatment decision based on the patient's lack of symptoms and the information available at the time.
The defendant, Dr. Berry, testified that during a pelvic exam prior to the D & C procedure, the patient's cervix dilated easily, a fact consistent with a loss of blood and tissue within the preceding twenty-four hours. He examined the patient's adnexa and did not find any masses. Dr. Berry opined that the amount of tissue he recovered during the D & C indicated an intrauterine pregnancy and that an ectopic pregnancy would have produced little or no tissue. He did not consider another pregnancy test necessary in light of the clinical findings at the time. Dr. Berry testified that a physician's duty to follow-up a patient with diagnostic tests involves the exercise of clinical judgment based on the patient's response to earlier treatment, her symptoms and the physician's resulting index of suspicion.
At trial, Dr. Warren West explained that when he saw Angelia Simmons in November 1987, his index of suspicion for ectopic pregnancy was low because her only complaint was slight vaginal bleeding and her physical exam was normal. He stated that on December 3, 1987, Simmons had still not complained of abdominal pain, although she *693 reported spotting on November 29, 1987 and feeling slight left side pain on November 30, 1987. Dr. West testified that he ordered an ultrasound, which did not indicate an ectopic pregnancy because of the absence of lateral masses and the lack of fluid in the cul-de-sac. After the ultrasound, he informed Simmons that her pregnancy was lost because a fetus was not visible.
Dr. West explained that when the D & C did not recover products of conception, he had no reason to think that Simmons was still pregnant. Dr. West testified that based on the information available, including the ultrasound showing an apparent chorionic sac remnant, Simmons' episode of abdominal pain and bleeding on December 6, 1987, the amount of tissue recovered from the uterus, the patient's positive response to the D & C and her subsequent lack of symptoms, it was his judgment that further testing was not necessary.
The trial court heard and assessed the conflicting expert testimony and weighed the credibility of the witnesses. When the expert opinions contradict concerning compliance with the applicable standard of care, the trial court's conclusions on this issue will be given great deference. It is within the factfinder's province to evaluate the credibility of such experts and their testimony. Cox v. Willis-Knighton Medical Center, supra.
Here, experts differed regarding the accuracy of certain tests during the relevant time period, and the reasonableness of the defendants' decision to forego additional testing when the patient was asymptomatic for approximately one month. The trial court chose between two competing views of the evidence. Although we might differ in our conclusion regarding the medical treatment provided by the defendants, after reviewing the entire record, we cannot say that the trial court was clearly wrong in its evaluation of the expert testimony or in its ultimate finding that Dr. West and Dr. Berry were not negligent in failing to diagnose the ectopic pregnancy. The assignment of error lacks merit.
In concluding that the trial court was not clearly wrong in finding that the defendants met the standard of care in their treatment of Angelia Simmons, we pretermit a discussion of the plaintiffs' final assignment of error addressing the issue of damages.

CONCLUSION
For the foregoing reasons, the trial court's judgment is affirmed. The costs of this appeal are assessed to the appellants, Angelia and Gregory Simmons.
AFFIRMED.

APPLICATION FOR REHEARING
Before MARVIN, C.J., and NORRIS, HIGHTOWER, WILLIAMS and CARAWAY, JJ.
Rehearing denied.