705 So.2d 262 (1997)
Suzanne C. MARKS, Plaintiff-Appellant,
v.
Kenneth B. JONES, Jr., M.D., et al., Defendants-Appellees.
No. 29881-CA.
Court of Appeal of Louisiana, Second Circuit.
December 10, 1997.
*263 Nelson & Hammons by John L. Hammons, Shreveport, for Plaintiff-Appellant.
Blanchard. Walker, O'Quin & Roberts by Lawrence W. Pettiette, Jr., Paul M. Adkins, Shreveport, for Defendant-Appellee Louisiana Patient's Compensation Fund.
Mayer Smith & Roberts, by Caldwell Roberts, Shreveport, for Defendants-Appellees Dr. Kenneth B. Jones and St. Paul Fire & Marine Insurance Company.
Before HIGHTOWER, WILLIAMS and GASKINS, JJ.
GASKINS, Judge.
This medical malpractice case concerns several gastroplasty surgeries performed on a morbidly obese patient and the subsequent postoperative care she received which allegedly caused her to develop severe complications. For the reasons assigned below, we affirm the trial court judgment in favor of the defendants.

FACTS

Medical history
The plaintiff, Suzanne Marks, had a significant history of various physical, emotional, and psychiatric problems throughout her tragic life. She was born in 1943.[1] Her lifelong battle with depression began while she was a teenager. She married in 1962 and received a fine arts degree in 1964. During her marriage, she gave birth to two daughters, Melissa and Michelle. In 1972, while living in Connecticut, she attempted suicide and was hospitalized for several months, during which time she received electric shock therapy. She and her husband divorced in the early 1970's; she and her daughters moved to Shreveport, Louisiana, where her parents resided. In 1975, she lost both of her parents and a younger brother in an airplane crash. In the face of these traumatic events, Mrs. Marks' emotional and psychiatric problemswhich included psychotic depression, hallucinations and insomniaescalated, as did her weight. At the time of her divorce, Mrs. Marks weighed 148 pounds; by 1979, her weight was in excess of 300 pounds. This weight gain caused her tremendous emotional distress. Her efforts to diet were frustrating and unsuccessful.
In the mid-1970's, she received psychotherapy and medication at the Shreveport Mental Health Center on a regular basis. From February 9, 1979 to April 10, 1979, she was hospitalized at LSU Medical Center (LSUMC) for psychotic depression. During this hospitalization, one psychologist rendered a diagnostic impression of "schizophrenia, paranoid type"; she was also noted to be "hostile and manipulative," as well as "very obnoxious and withholding."
In the hopes of improving her emotional state and her physical health, Mrs. Marks was referred to Dr. Kenneth B. Jones, a general surgeon who practiced bariatric surgery, for weight loss. Her psychiatrist felt there were no impediments to the surgery and that a good result would be of tremendous benefit to her. On November 2, 1979, the plaintiff, then age 35, underwent bariatric surgery at Doctor's Hospital. Dr. Jones utilized the Pace-Kerry technique, a horizontal gastroplasty.[2] Although this procedure was eventually discontinued because of its high failure rate, at the time of the surgery it was accepted as an appropriate method.
Although Mrs. Marks initially lost weight, she later regained it because the stoma, the opening between the upper and the lower stomach pouches, enlarged. By February *264 1982, she again weighed in excess of 300 pounds. Because she had lost her insurance coverage since the first procedure, Dr. Jones referred her to LSUMC for revision surgery. The LSUMC medical staff did the presurgery work-up on Mrs. Marks. She was approved for the surgery by the surgical and the psychiatric services. A gastroscopy procedure in April 1982 revealed that the stoma was larger than expected. Although she was originally scheduled for revision surgery in June 1982, this procedure could not go forward because she was taking Parnate, an antidepressant medication. She was directed to discontinue this medication and return later. Upon her admission for surgery on July 10, 1982, Dr. John C. McDonald, the chairman of the LSUMC surgery department, was listed as her attending physician. Revision surgery was preformed on July 12, 1982, using the Gomez technique or a greater curvature gastroplasty. The operative report was dictated and signed by Dr. Karl LeBlanc, a senior surgical resident, who was designated as the surgeon on the procedure. Dr. Jones and Dr. Rene Dugas were listed as assisting; Dr. Jones was also listed on the report as attending surgeon. According to his trial testimony, Dr. Jones was present at the request of both the patient and the LSUMC staff because of his experience with the patient and the procedure. He had no independent recollection as to how much, if any, of the actual surgical procedure he performed on Mrs. Marks that day.
Following this surgery, Mrs. Marks was treated by LSUMC physicians. The medical records for this hospitalization contain no notations by Dr. Jones. She was discharged on July 21, 1982, and was followed by the LSU Surgical Clinic. On August 7, 1982, she returned to LSUMC complaining of dizziness and weakness. She denied experiencing nausea or vomiting; she was diagnosed as hypertensive due to her antidepressant medication, which was temporarily discontinued.
She was readmitted to LSUMC on October 14, 1982, with complaints of nausea and vomiting after every meal for the past two months. Again Dr. McDonald was listed as the attending physician. (Dr. Jones was never notified of this hospitalization or otherwise consulted.) During this hospitalization, she was closely followed by the medical, psychiatric, and dietary staff of LSUMC. Although she had frequent nausea and vomiting with meals, nurses' notes also indicate that she was able to keep down many meals, particularly toward the end of this hospitalization. There were also indications that some vomiting was self-induced. An upper GI series and a gastroscopy were performed with unremarkable results. In particular, the gastroscopy on October 20, 1982, revealed an adequate gastric outlet. Her laboratory results during this time period were essentially normal and failed to show signs of malnutrition. On October 29, 1982, a neurological consult was obtained; her blurred vision and neurological weakness were interpreted as "possible early or partial Wernicke's syndrome." Wernicke's syndrome is a neurological disorder caused by thiamine deficiency; it is frequently characterized by nystagmus (involuntary eye movement) and ataxia (impaired muscular coordination). Intravenous (IV) thiamine and a course of intramuscular thiamin were prescribed by the LSUMC doctors; oral multivitamins were also begun. She was discharged on November 19, 1982, with follow-up appointments at the LSUMC Surgery Clinic and the Shreveport Mental Health Center.
On December 21, 1982, Mrs. Marks was readmitted to LSUMC with complaints of nausea, vomiting and depression; once again, Dr. McDonald was listed as her attending physician. She was diagnosed as suffering from hypokalemia (decreased potassium), which was considered secondary to nausea and vomiting, which in turn was deemed probably secondary to major depression. (Early in this admission, she told one doctor that she had "no desire to live"; this doctor noted her belief that Mrs. Marks' emotional state "at least" contributed to her physical symptoms.) During this admission, a physical cause to the nausea and vomiting was ruled out; she went several days without vomiting. A gastroscopy revealed a possible slight stricture of the stoma, but it was felt that this was most likely the result of angulation. She was discharged on January 9, 1983.
*265 On January 13, 1983, Mrs. Marks was again admitted to LSUMC with Dr. McDonald listed as her attending physician. Bulimia was noted as a possible explanation for her vomiting. A psychiatric consult offered the opinion that the vomiting was more likely caused by the operation than self-induced. However, during this two-day hospitalization she was observed to cause vomiting by sticking her finger down her throat. Additionally, observation of Mrs. Marks after meals did not support her assertion of nausea and vomiting after every meal.
On January 17, 1983, for the first time since the July 1982 surgery, Dr. Jones was consulted. Dr. Cotter at LSUMC called Dr. Jones and informed him of Mrs. Marks' vomiting. Dr. Jones told him that, if the etiology of her vomiting was a stoma problem or angulation, he would do a surgical correction. A decision was slated to be made at her next clinic appointment.
On January 25, 1983, Mrs. Marks saw Dr. Jones for the first time since her July 1982 surgery. He found that she had lost about 100 pounds, which put her at about average for post surgery weight loss. He found her to be clinically weak and moderately dehydrated. However, her laboratory studies were within the normal range.[3] He spoke to her on the telephone on January 28, 1983, and instructed her to return to see him in 10 days and to keep her LSUMC clinic appointment the following week.
On February 8, 1983, Dr. Jones spoke to Dr. Cotter again; he referred Mrs. Marks back to LSUMC and noted the possible need for reversal of her surgery. On that day, she was admitted to the surgery service at LSUMC; once again Dr. McDonald was listed as the attending physician. At this admission, it was noted that she had reportedly ceased taking her medications three weeks beforehand. An upper GI series run on February 10, 1983, showed a narrow but open anastomosis, or opening. During this lengthy hospitalization, which lasted 56 days, Mrs. Marks suffered from pancytopenia, a bone marrow depression, which was ultimately found to be caused by a reaction to an antibiotic she was given. Due to the pancytopenia, intravenous (IV) hyperalimentation was administered for a period of about five days.[4] She was treated at various times on the medical and psychiatric services. Dr. Solomon on the surgical service advised against reversal of the gastroplasty at that time. She was discharged on April 5, 1983. Dr. Jones was not involved in this hospitalization.
On May 18, 1983, Mrs. Marks returned to see Dr. Jones at his office. He continued her on the course of thiamine which had been begun in the hospital. She returned to his office again on July 6, 1983, for laboratory work. Her lab results showed that her potassium was slightly low, but failed to support her claims that she was vomiting after every meal. However, she had lost 18 pounds in the last six weeks; Dr. Jones noted that if she continued to lose weight at this rate over the next two to four weeks, he would have to do something more definitive. He also noted his concern that she was "bring[ing] on a lot of this stuff herself," by causing herself to vomit.
On August 9, 1983, Dr. Jones secured Mrs. Marks' admission to Schumpert Medical Center (SMC) as a charity case. He was listed as her attending physician; at this time, Mrs. Marks weighed about 140 pounds. Although a gastroscopy showed that the stoma was tight, it was successfully dilated. On August 18, 1983, he performed a gastroplasty procedure in which he enlarged the stoma. Afterwards she continued to vomit on occasion. Prior to her discharge from SMC, Dr. Jones noted his concerns that she was suffering from bulimia or anorexia nervosa because of the depression caused by her fear of regaining weight. From the time of her discharge from SMC on September 21, 1983, until July 25, 1985, Dr. Jones had no contact with Mrs. Marks.
*266 Upon her discharge from SMC, she was transferred to the Central Louisiana State Hospital in Pineville, at the request of her treating psychiatrist. She remained there until December 30, 1983. During this time, she apparently exhibited signs of an eating disorder by inducing vomiting and expressing fears about regaining weight. Dr. Ellis Wilkerson, a consultant who assessed her, recounted in his report that when he told Mrs. Marks that he hoped to help her regain her strength and eat without nausea, she began to cry and said, "you want me to become fat again." This consultant concluded that she had a phobic fear of regaining weight, and he felt that her "gastrointestinal systematology is largely, if not entirely, on a psychiatric basis." Her final diagnosis there included dysthymic disorder, anorexia nervosa. However, by the time of her discharge, she had improved to the point that the vomiting was only occasional and she told the staff that she did not see this as a "big problem" for her.
Over time, the plaintiff developed other maladies which were largely due to the Wernicke's syndrome, including bowel and bladder dysfunction, loss of motor functions, and slurred speech. She also became legally blind. Periodically, she resided in nursing homes.
In August 1984, she was admitted to LSUMC for 12 days. She was diagnosed as having cerebellar dysfunction and peripheral neuropathy[5] secondary to nutritional deficiency. In addition to major depression, she was also noted to have nystagmus and mild ataxia.
In July 1985, she was admitted to Riverside Community Hospital in Bossier City for dehydration and an anorexia work-up. At this time, she was under the care of Dr. Robert Savory, a family doctor. A gastroscopy was performed by Dr. Barry Osherwitz, a gastroenterologist; at best, the results showed that the stoma had significantly narrowed.[6] However, an upper GI series showed that barium was able to pass through the stoma into the gastroplasty pouch. Dr. James R. Shamblin, a bariatric surgeon, was also consulted, as was Dr. Jones.
Dr. Jones told Mrs. Marks that she had three options: reversal of the gastroplasty, which she refused; insertion of a gastrostomy or feeding tube, which she also refused; or revision of the stoma. Dr. Shamblin also recommended reversal. Mrs. Marks adamantly refused the reversal of the gastroplasty, asserting to several of her doctors that she would rather die than regain weight. Consequently, on July 29, 1983, Dr. Shamblin performed a revision surgery. Both before and after this procedure, she was given IV hyperalimentation. She was discharged to a nursing home on August 2, 1985.
Mrs. Marks was seen in the emergency room at LSUMC on November 1, 1985, with complaints of nausea and vomiting for the past two days. She was admitted to the hospital on that occasion for major depression with suicidal indications, anorexia, dependent personality and multiple medical problems secondary to poor nutrition. She was discharged on November 5, 1985. However, she was readmitted on November 12, 1985 for a two-day stay with a similar diagnosis of major depression, atypical eating disorder, passive aggressive personality and anorexia. At that time, it was noted that she was still suicidal. She was also uncooperative and manipulative, refusing to eat "primarily because she doesn't want to get FAT! [emphasis theirs]"
Over the next several years, Mrs. Marks continued to have frequent emergency room visits and hospital admissions for a variety of ailments, including nausea and vomiting. She resided either in nursing homes or at home with sitters in attendance. Beginning *267 in about 1987, Dr. Thomas Morris became her primary care doctor. His records for the next eight years demonstrate a history of recurrent nausea and vomiting. In 1988, she was admitted to Lincoln General Hospital for nausea, vomiting, and the worst headache "she has ever had"; information obtained from the Center for the Blind indicated she had had "increasing problems with nausea, vomiting and possibly [bulimic] behavior." There were also episodes of nausea and vomiting in 1989 and 1990.
In 1992, she had several episodes of nausea and vomiting which were attributed to a partial gastric outlet obstruction. Of particular note, in September 1992, she complained that she vomited everything she ate, yet her laboratory values were normal. During this time period, she was referred to Dr. Dale Boersma. In his notes, he observed that there were "so many inconsistencies in her story that I am afraid to do much for her." He was concerned that she might be "starving herself." When she insisted to him that she would die if he did not do a gastrostomy, he told her that he did not "like to be coerced." He elected not to perform surgery on her. In November 1993, her records of admission to the Summit Institute for Pulmonary Medicine and Rehabilitation in West Monroe showed complaints of nausea and vomiting and a history of anorexia.
Mrs. Marks continued to be a difficult patient to treat. In his notes, Dr. Morris frequently documented his frustrations in dealing with her. On several occasions, he threatened to resign as her physician because of her refusal to cooperate. During a four-day admission to LSUMC for paranoia in November 1986, she was noted to be cooperative but manipulative, telling the staff that she had a strychnine pill with which she could kill herself at any time. When she was examined by a neuro-ophthalmologist in 1990 and 1993, he found her to be uncooperative and noted that her vision problems could be partially psychiatric. (Dr. Morris made a similar observation, questioning the true extent of her vision problems.)
In December 1995, the plaintiff was admitted to the hospital for non-medical reasons after Dr. Morris was informed that she was at home alone with no one to care for her. During this admission, she died of cardiopulmonary arrest at the age of 52.

Procedural history
In April 1986, the plaintiff filed a complaint against Dr. Jones requesting a medical malpractice review panel pursuant to La. R.S. 40:1299.41 et seq. Dr. Jones filed an exception of prescription in the First Judicial District Court which was ultimately overruled by the trial court, Judge C.J. Bolin Jr., in October 1989. In January 1992, the medical review panel ruled in favor of Dr. Jones, finding that all three surgeries by Dr. Jones were within the acceptable standard of care.
In April 1992, the plaintiff filed the present law suit against Dr. Jones and his malpractice insurer, St. Paul Fire & Marine Insurance Company. The defendants filed a declinatory exception of lack of jurisdiction, a dilatory exception of prematurity, and peremptory exceptions of prescription and of failure to join an indispensable party. All of these exceptions were eventually overruled.
The defendants also answered and filed a third-party demand against the State of Louisiana as representing LSUMC. Although the plaintiff also eventually added LSUMC as a party defendant in this suit, all claims against it were dismissed as premature.
The plaintiff settled her claims against Dr. Jones and his insurer for $45,875; the settlement was approved by the trial court as required by La. R.S. 40:1299.44. However, the plaintiff reserved her rights to proceed against the Louisiana Patient's Compensation Fund (PCF) and the State of Louisiana. She also retained Dr. Jones as a nominal defendant only. PCF filed a cross-claim against the State of Louisiana, which was dismissed as premature. PCF also filed a peremptory exception of prescription.
Following Mrs. Marks' death, her two adult daughters were substituted as parties in her place.[7] Since the daughters did not *268 bring a wrongful death action, trial was held on survival action damages only.
Prior to trial, the plaintiff filed a motion in limine to exclude references to the alleged fault of LSUMC; the motion was denied. A four-day bench trial was held in January 1996. In late April 1996, the trial court rendered a written opinion, ruling in favor of Dr. Jones. The court made several findings of fact, including the following: (1) although the first surgery by Dr. Jones was unsuccessful, there was no breach of the applicable standard of care; (2) Dr. LeBlanc and other LSUMC doctors rendered postoperative care following the July 1982 surgery; (3) the first signs of Wernicke's syndrome manifested during the October 1982 LSUMC readmission, when Dr. Jones was not treating her; (4) it is unclear what caused the thiamine deficiency and Wernicke's syndrome but it occurred while she was under treatment by LSUMC doctors, not Dr. Jones; (5) the standard of care in 1982 to 1985 did not require Dr. Jones to send a certified, registered letter conveying follow-up directives; and (6) the care rendered by Dr. specifically the revision surgery, complied with the applicable standard of care. The court adopted the rationale of the 1989 ruling of Judge Bolin on the prescription issue. In conclusion, the court found that many, if not all, of the plaintiff's problems were caused by her obsessiveness with her weight and her noncompliance with medical directives, including the self-induced vomiting which may have caused a stricture of the stoma or otherwise led to the thiamine deficiency.
The plaintiff filed a motion for new trial. Specifically, the plaintiff contended that the trial court erred in its evaluation of Dr. Jones' credibility; she maintained that she had successfully impeached him on the issue of his status at LSUMC between 1979 and 1985. In a written opinion rendered in September 1996, the trial court denied the motion for new trial. The court declined to find that Dr. Jones had intentionally deceived the court but found that he was "unclear and mistaken in his recollection" as to whether he was on LSUMC's active staff or a member of the courtesy staff. (The importance of this distinction lies in the degree of the doctor's patient care responsibility.) The trial court also found that Dr. Jones prescribed liquid vitamin supplements when necessary and ordered IV hyperalimentation when medically appropriate.
The plaintiff appeals.

ATTACKS ON THE TRIAL COURT
In an effort to avoid application of the manifest error rule, which mandates that deference be accorded to the trial court's findings of fact, the plaintiff makes several attacks upon the integrity of the trial court.

Internal inconsistencies
The plaintiff contends that portions of the trial court's opinion are internally inconsistent on the issue of whether Dr. Jones was her treating physician in 1982. In particular, the plaintiff refers to the trial court's finding that Dr. Jones was not her treating physician in October 1982, while nonetheless accepting Judge Bolin's 1989 prescription ruling. The plaintiff characterized Judge Bolin's ruling as finding that Dr. Jones retained primary responsibility for Mrs. Marks' care from November 1979 to July 1985.
Judge Bolin actually rendered two opinions on prescription. In the first one, rendered in 1989, he found that Dr. Jones "either performed, assisted or was consulted in the first three operations and was again consulted by the surgeon before the operation of July 24, 1985." In the second opinion, rendered in 1990, after a request for reconsideration, Judge Bolin referred to Dr. Jones as the plaintiff's "primary physician from 1979 to approximately June 25, 1985," then recited the same underlying facts stated in the prior opinion. As further evidence of internal inconsistencies, the plaintiff also refers to the trial court's adoption of the medical review panel, wherein, she claims, the panel found that Dr. Jones was her primary treating physician from November 1979 to July 1985.
In response, PCF argues that the trial court adopted only the "rationale" of Judge Bolin's ruling. We agree. In the original opinion, the trial court made the following ruling on the issue of prescription:

*269 [T]he claims against Dr. Jones have not prescribed; to the contrary, this Court accepts the rationale set forth by former District Judge C.J. Bolin, Jr. in his 1989 Ruling....
In his 1989 ruling on prescription, Judge Bolin made no reference to Dr. Jones as Mrs. Marks' primary physician.
The plaintiff also asserts that the trial court adopted the opinion of the medical review panel which, she asserts, specifically concluded that Dr. Jones was her primary treating doctor from 1979 until Dr. Shamblin took over primary responsibility in 1985. However, we note that the trial court's exact finding was that it "accepts the testimony and panel decision of Drs. Charles Knight, Jr., Keith Mason, Jr., and Charles Chappius, Jr., who unanimously concluded that Dr. Kenneth Jones met the applicable standard of care as a surgeon treating Mrs. Marks from 1979 through 1985; ..." In a footnote, the trial court then noted the panel's finding that during part of this time, Dr. Jones "was following her care while treatment was afforded at LSUMC."
Thus, we are unable to conclude that the trial court held, directly or by implication, that Dr. Jones was Mrs. Marks' primary treating physician from November 1979 to July 1985. We find no evidence of internal inconsistencies which would cause this court to find the rule of manifest error inapplicable and to refuse to accord due deference to the trial court's findings.

Footnotes in trial court opinion
The plaintiff argues that the trial court erred in making "irrelevant, immaterial and highly prejudicial comments" in two footnotes in its original opinion and that these comments constituted a breach of the trial court's obligation to remain objective, fair-minded and unbiased. Consequently, the plaintiff contends that this court is not bound by the lower court's findings of fact or application of law.
In the original opinion, the trial court noted that the action before it was a survival action. In footnote 3, the trial court stated:
A wrongful death action has not been filed. Although it is not material to this lawsuit. Melissa Johnson and Michelle Luijben Do were estranged from their mother and there was evidence that their relationship with her has been poor for more than a decade.
Later in the original opinion, the trial court made reference to Dr. Jones securing Mrs. Marks' admission to SMC as a charity case. The trial court then made the following observation in footnote 8:
Moreover, it is the view of this Court that Dr. Jones should receive a humanitarian award for his valiant efforts in 1983 when he arranged admission of Mrs. Marks as a charity case and paid for some lab work personally.
In footnote 3, the trial court was merely endeavoring to explain the absence of a wrongful death claim by Mrs. Marks' daughters, who had been substituted as parties following their mother's death. We read no sinister purpose into this simple explanation which was well supported by the record. Nor do we find footnote 8 objectionable. The trial court, as the trier of fact, was entitled to evaluate the credibility of witnesses; it is obvious that the court was favorably impressed with Dr. Jones despite plaintiff counsel's impeachment efforts, which will be discussed infra. By lauding Dr. Jones' efforts to assist Mrs. Marks as "valiant," the trial court was expressing its credibility determination.
We find no evidence of bias on the part of the trial judge.

Violation of local court rules
As further evidence of the trial court's alleged bias against her, the plaintiff contends that the trial court violated local court rules by signing a judgment not presented to plaintiff's counsel. In brief, defense counsel strenuously contests the veracity of this claim.
We decline to review this matter in any detail. We note only that there is inadequate evidence in the appellate record to support or refute this allegation and, at any rate, her allegations fail to support a claim of bias.

*270 Rejection of bias claims

After due consideration, we emphatically reject the plaintiff's accusations of bias on the part of the trial court. Since we find no merit to the plaintiff's claims, we decline her suggestion that we review the case de novo, and we will apply the rule of manifest error to our review of the trial court's judgment.

MEDICAL MALPRACTICE
The plaintiff contends that Dr. Jones was negligent in two primary respects, (1) failing to administer hyperalimentation, particularly intravenous (IV) hyperalimentation, postoperatively and (2) in failing to respond to her persistent nausea and vomiting from 1982 to 1985.[8]

Law
In a malpractice action based on the negligence of a physician licensed to practice in Louisiana, where the defendant practices in a particular specialty and the alleged acts of medical negligence raise issues peculiar to that specialty, the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians within that medical specialty. La. R.S. 9:2794(A); Roberts v. Cox, 28,094 (La.App.2d Cir. 2/28/96), 669 So.2d 633; Simmons v. West, 29,633 (La.App.2d Cir. 6/18/97), 697 So.2d 688.
In a medical malpractice action against a physician, the plaintiff must first establish by a preponderance of the evidence that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and the injury sustained. Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991); Roberts v. Cox, supra. Credibility determinations, including the evaluation of expert testimony, together with the ultimate issue of whether a plaintiff has satisfied his burden of proof are factual issues to be resolved by the trier of fact and will not be disturbed on appeal in the absence of manifest error. Iseah v. E.A. Conway Memorial Hospital, 591 So.2d 767 (La.App. 2d Cir.1991), writ denied, 595 So.2d 657 (La.1992); Martin v. East Jefferson General Hospital, supra; Roberts v. Cox, supra.
A physician is not required to exercise the highest degree of care possible. Rather, his duty is to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances. The law does not require absolute precision from a physician. A physician's conduct and professional judgment must be evaluated in terms of the reasonableness under the existing circumstances and should not be viewed in hindsight and in terms of results or in light of subsequent events. Iseah, supra. The mere fact that an injury occurred does not raise a presumption that the physician was negligent. La.R.S. 9:2794(C).
Expert witnesses who are members of the medical profession are necessary sources of proof in medical malpractice actions to determine whether the defendant doctor possessed the requisite degree of skill or knowledge, or failed to exercise reasonable care and diligence. Hughes v. Bailey, 29,314 (La.App.2d Cir. 4/2/97), 691 So.2d 359; Martin v. East Jefferson General Hospital, supra.
A reviewing court will give great deference to the findings of fact when medical experts express different views, judgments, and opinions on whether the standard of care was met in any given case. The reviewing court must give great weight to the factual findings of the trier of fact. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of *271 manifest error. Rosell v. ESCO, 549 So.2d 840 (La.1989); Hughes, supra.

Medical Testimony
Dr. Ira Klein, a gastroenterologist from Houston, Texas, testified on behalf of the plaintiff that Dr. Jones was negligent because he failed to administer IV hyperalimentation after the 1982 surgery. In Dr. Klein's opinion, Dr. Jones also should have performed a complete take-down of Mrs. Marks' gastric surgery. In connection with this alleged negligence, he also testified that Dr. Jones was obliged to send Mrs. Marks a certified registered letter warning her of the dangers if she refused a reversal of her gastric surgery. According to Dr. Klein, of all the doctors who treated Mrs. Marks, Dr. Jones was the only one primarily at fault because he performed the 1982 surgery and would have been the primary doctor responsible for her follow-up.
Dr. John England, a neurologist, examined the plaintiff in 1993. He testified that in the developed world, Wernicke's syndrome is caused by either alcoholism or insufficient diet. The critical window is a few hours or even a day or two after the symptoms first develop; in order to prevent residual damage, thiamine should be administered promptly. His only criticism of Dr. Jones, as noted in a letter to plaintiff counsel, was that he should have ensured she took or was instructed to take a vitamin supplement including thiamine. However, he testified that the exact timing for thiamine depletion is not clear.
All three members of the medical review panel testified on behalf of PCF. Dr. Keith Mason, a general surgeon; Dr. Charles W. Chappuis, a general surgeon; and Dr. Charles Knight, a general surgeon specializing in vascular surgery, unanimously testified that Dr. Jones breached no standard of care in his treatment of Mrs. Marks. They essentially agreed that the objective evidence (normal laboratory values, upper GI series and gastroscopy results) following the 1982 surgery did not support a finding of malnutrition which would have justified the use of hyperalimentation, particularly IV hyperalimentation, on this patient. Dr. Shamblin and Dr. Osherwitz, both of whom participated in Mrs. Marks' care in 1985, agreed.
Dr. Otto Willbanks, an expert in general surgery and bariatric surgery, was a past president of the American Society of Bariatric Surgeons. On behalf of PCF, he testified that he had thoroughly reviewed the record and found no evidence of negligence on the part of Dr. Jones. He also testified that to reverse the gastric surgery without the patient's consent would constitute a criminal assault. Dr. Knight and Dr. Jones concurred with that statement. Dr. Jones and Dr. Shamblin both testified that Mrs. Marks refused to consent to a reversal, declaring that she would rather die than regain her weight. Drs. Mason, Willbanks, and Knight all agreed with Dr. Jones that there was no obligation on the part of a doctor to send a certified registered letter to a patient informing her of the potential consequences of failing to take the physician's advice.
Much is made of the confusion over Dr. Jones status on the LSUMC staff. The plaintiff contends that he was a member of the active staff at LSUMC and, as such, was her attending physician who bore primary responsibility for her postoperative care there. Dr. Jones himself initially testified that he was a member of the "visiting" staff, which donates time and services, as opposed to the active staff, which earns a living by working at LSUMC. He testified that he had not admitted a patient to LSUMC since he ended his residency there in 1973. On cross-examination, Dr. Jones was presented with a series of documents wherein he was designated as a member of the active staff with full privileges as opposed to a member of the "courtesy" staff; no reference was made on these documents to a "visiting" staff. On redirect examination, he explained that while "officially" he appeared to have these privileges, "unofficially" things were done differently.
The plaintiff contends that she successfully impeached Dr. Jones on the issue of his staff status and that, consequently, his testimony should be viewed with suspicion. However, in its ruling on the plaintiff's motion for new trial, the trial court specifically declined to find that Dr. Jones had been impeached. *272 Instead the court found that Dr. Jones was "unclear and mistaken in his recollection" and refused to find that he had "intentionally deceived or lied to the Court." Interestingly, Dr. Jones was apparently not alone in his confusion as to staff status. In his testimony, Dr. Knight also spoke of the LSUMC staff in terms similar to those expressed by Dr. Jones. As a member of the "visiting" staff himself, Dr. Knight did clinical teaching at LSUMC; he could also refer patients there and even participate in surgery. However, Dr. Knight testified that he could not admit patients there and he could not be a patient's attending physician.
At any rate, we find Dr. Jones' staff status is not dispositive of the ultimate outcome of this case. During his testimony, Dr. Jones reviewed Mrs. Marks' medical records during the relevant time period following her 1982 surgery. He testified that, given her normal laboratory values and the normal results on her gastroscopy and upper GI series, he would not have put a patient with these results on such an extreme measure as IV hyperalimentation. He, Dr. Knight and Dr. Willbanks all testified that there were significant dangers associated with the use of IV hyperalimentation, which involves surgical placement of an IV catheter in a major vein such as the jugular in the neck or the subclavian under the collar bone; consequently, resort to IV hyperalimentation was not to be undertaken lightly.[9] The majority of the medical evidence presented at trial supported Dr. Jones' position on this issue.
Furthermore, we find that at no time did Dr. Jones fail to respond appropriately when the plaintiff sought his assistance. He either treated her himself or referred her to appropriate medical care elsewhere. Due to her long-standing and well-documented psychiatric problems and her episodes of self-induced vomiting, Dr. Joneslike the many other health care professionals treating herreasonably explored the possible psychiatric causes of her nausea and vomiting. Tragically, the evidence in the record before us strongly indicates that such was, in fact, the case and that the trial court was correct in its assessment that much of Mrs. Marks' problems resulted from her obsessiveness and her noncompliance.
In summary, after a careful review of the record, we cannot say that the trial court was clearly wrong in its evaluation of the expert testimony or its ultimate conclusion that Dr. Jones was not negligent in his medical treatment of the plaintiff, Mrs. Marks.
Inasmuch as we conclude that the trial court was not manifestly erroneous in finding that Dr. Jones maintained a proper standard of care, we pretermit the plaintiff's assignments of error pertaining to damages and to "multiple cap" claims under the Louisiana Medical Malpractice Act.

MOTION IN LIMINE
The plaintiff contends that the trial court erred in denying her motion to exclude evidence of third party fault by LSUMC. She contends that since Dr. Jones' third-party claims against LSUMC were dismissed as premature because they had not been submitted to a medical review panel, the trial court should have granted her motion. We find that this argument lacks merit. In order to completely understand the plaintiff's medical condition, it was necessaryif not vitalto consider the role played by the LSUMC staff in her overall treatment.

CONCLUSION
For the reasons assigned above, we affirm the judgment of the trial court. Costs are assessed against the appellant/plaintiff.
AFFIRMED.
NOTES
[1] We note a slight discrepancy in this voluminous record as to Mrs. Marks' year of birth which is given alternatively as 1942, 1943 or 1944. However, 1943 was the date given by Mrs. Marks in her second deposition and is the date most often found in the majority of her medical records.
[2] This technique is spelled Pace-Kerry by defense counsel and Pace-Cary by plaintiff counsel.
[3] Dr. Jones personally paid for these and other laboratory tests at his office because Mrs. Marks was unable to afford them. We note this fact due to its relevance to one of the plaintiff's arguments on appeal, which is discussed infra.
[4] Hyperalimentation is the ingestion or administration of greater than optimal amounts of nutrients.
[5] Neuropathy is a general term denoting functional disturbances and/or pathological changes in the peripheral nervous system.
[6] The exact results of this endoscopy are disputed. Apparently at trial some of Dr. Osherwitz's records were no longer available, and he had no independent memory of the procedure. However, in one discharge report it was stated that the stoma "was totally closed down" while another stated that there was a stenosis of the stoma "to the point where a gastroscope or a dilator could not be introduced." Dr. Shamblin testified that his recollection was that, while small, the stoma was visualized by Dr. Osherwitz during the endoscopy.
[7] Despite this substitution, for clarity's sake, we refer only to "Mrs. Marks" or "the plaintiff" in the singular throughout this opinion.
[8] In the initial stages of litigation, the plaintiff asserted surgical negligence on the part of Dr. Jones. However, before this court, she does not argue that Dr. Jones was negligent in his performance of her surgical procedures.
[9] The record demonstrates that Mrs. Marks was given IV hyperalimentation when she was desperately ill with pancytopenia in 1983. IV hyperalimentation was also administered before and after the 1985 surgery, at which time she was described as "quite thin"; several doctors testified that such hyperalimentation would not have been necessary in connection with the 1982 surgery when she was morbidly obese and obviously still receiving substantial nourishment.