I PEATROSS, J.
This medical malpractice action arises out of the tragic death of eleven-year-old Dontrelle Tucker (“Donnie”) following surgery to repair a minor hip defect performed at Glenwood Regional Medical Center (“Glenwood”) in Monroe. A unanimous jury found that there was no breach of the standard of care regarding Donnie’s care at Glenwood. Debra Sensley, Donnie’s mother, appeals. For the reasons stated herein, we affirm.

FACTS

Donnie was diagnosed by Dr. Charles Hand, an orthopedic surgeon, with a “slipped capital femoral epiphysis” on Donnie’s right hip. This condition occurs when the femur head slips slightly off of the femur. Dr. Hand recommended and subsequently performed a procedure commonly referred to as a “hip pinning” on Donnie’s right hip. This procedure entails drilling a hole in the femur and placing guide pins in the femur into which screws are inserted. After the screws are in place, the guide pins are removed.
The surgery was performed at 12:00 p.m. on February 15, 1996, at Glenwood. Donnie’s family was told that he would probably be discharged the same day of the surgery. After the surgery was complete (the surgery lasted approximately two hours), Donnie was taken off the ventilator and was breathing on his own for approximately 30 minutes post-surgery. Donnie was then taken from the operating room to recovery by Nurse Anesthetist Diana Gentry and was extubated, i.e., the endotracheal breathing tube was removed, without difficulty. After ensuring that Donnie’s condition was stable, Nurse Gentry transferred Donnie to the care of Nurse RRebecca Brown. At that point, Donnie had remained stable and there were no complications. At 2:08 p.m., Donnie’s vital signs were stable with blood pressure of 143/39, pulse 67, respiration 16 and oxygen saturation of 93 percent and he was breathing normally. Nurse Brown recorded in her notes that, at 2:08 p.m., Donnie’s respirations were even and unla-bored, he was moving air adequately and she could hear him breathing. At 2:10 p.m., Donnie’s heart rate had slowed to 62. At this time, Donnie’s respirations and pulse began slowing and his blood pressure was falling. Nurse Brown performed a “jaw lift” on him, which is a painful maneuvering of the jaw forward to see if a patient responds. Donnie did not. By 2.T4 p.m., his vital signs were dangerously low and Nurse Brown paged Dr. Joe Travis, the anesthesiologist, to the recovery room. Nurse Brown testified that she did not leave Donnie unattended at any time during his recovery.
Dr. Travis was in attendance at Donnie’s bedside at 2:15 p.m. At that time, his vital signs were blood pressure of 57/41, pulse 56 and respiration 19. Dr. Travis testified that he used an ambu bag and mask to supply artificial respiration to Donnie and that air flowed freely into Donnie’s lungs. According to Dr. Travis, Donnie ventilated very easily, meaning that there was no *867 obstruction of the airway and no collapsed airway. Donnie, however, did not respond to the resuscitation efforts. His heart rate and blood pressure continued to drop and his heart did not respond to medications administered to increase his heart rate, nor did he respond to a nerve stimulator. Dr. Travis intubated Donnie, i.e., replaced the endotracheal breathing tube, and began heart compressions. A blood gas latest revealed that Donnie was acidotic and his oxygen level was very low. A cardiologist was summoned and ultrasounds of the heart and lungs were performed and an external pacemaker was attempted. Extensive resuscitative and diagnostic measures were performed on Donnie until approximately 4:00 p.m. at which time Donnie, who was then in a coma, was transferred to pediatric intensive care and put on a ventilator. After two days of being comatose, tests revealed no brain activity and, after discussion with Mrs. Sensley, Donnie’s life support was discontinued. Donnie died at 7:50 p.m. on February 17,1996.
The physicians who were involved with Donnie’s post-surgical care opined that Donnie’s death was the result of a fat embolism which occurs when fat is released into the circulatory system and travels to the major organs. Fat emboli causing death are rare and occur from fatty tissue being released from the bone into the blood during orthopedic surgeries. The fatty tissue lodges in the organs and can cause death. Dr. George McCormick performed an autopsy on Donnie and found multiple fat emboli in the brain, kidneys and lungs. Dr. McCormick concluded that “these emboli caused multiple organ failure and death, with the most severely affected organ being the brain.”
Mrs. Sensley filed this medical malpractice complaint against several of the health care providers who cared for Donnie. Pursuant to La. R.S. 40:1299.39 et seq., the matter was presented to a Medical Review Panel composed of Percy A. Ford, Jr., Austin Gleason, M.D., Scott McClellan, M.D. and Larry M. Allen, M.D. The panel rendered its opinion |4on November 18, 1998, unanimously holding that the evidence did not support the conclusion that the defendants failed to meet the applicable standard of care as charged in the complaint. The Medical Review Panel’s opinion stated:
It was a tragic event that occurred with this child. As pointed out, fat embolism is not an occurrence that arises very often and when it does, it is an overwhelming surgical complication that oftentimes leads to catastrophic results such as those found here. Even though we have made many advances in medicine, the predictability of fat embolism is not yet well defined and the ability to cope with and treat such an event is still beyond our reach. There was no medical malpractice which occurred in the care delivered to Dontrell Tucker.
Mrs. Sensley then filed a civil suit naming only Dr. Hand and Glenwood as defendants. Summary judgment was subsequently granted in favor of Dr. Hand and the matter proceeded to trial against Glen-wood alone. As previously stated, the jury unanimously found no breach of the standard of care. This appeal ensued.

APPLICABLE LAW FOR MEDICAL MALPRACTICE

In a medical malpractice action against a hospital, the plaintiff must prove, as in any negligence action, that the defendant owed the plaintiff a duty to protect against the risk involved, that the defendant breached that duty, that the plaintiff suffered an injury and that the defendant’s actions were a substantial cause in fact of the injury. Gordon v. Willis Knighton *868 Medical Center, 27,044 (La.App.2d Cir.6/21/95), 661 So.2d 991, writs denied, 95-2776 and 95-2783 (La.1/26/96), 666 So.2d 679. A determination of whether a hospital has breached those duties depends upon the facts and circumstances of each particular case. Id.; Smith v. State through Dept. Health and Human Resources Admin., 523 So.2d 815 (La.1988); Hunt v. Bogalusa Community Medical Center, 303 So.2d 745 (La.1974). Resolution of each of these inquiries are determinations of fact which should not be reversed on appeal absent manifest error. Rosell v. ESCO, 549 So.2d 840 (La.1989); Smith, supra.
If the jury’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Rosell, supra.
It is the sole province of the fact finder to evaluate the credibility of such experts and their testimony. Arceneaux, supra; Cox v. Willis-Knighton Medical Center, 28,632 (La.App.2d Cir.9/25/96), 680 So.2d 1309, writ denied, 96-2831 (La.1/10/97), 685 So.2d 147. When the expert opinions contradict concerning compliance with the applicable standard of care, the fact finder’s conclusions on this issue will be granted great deference. Shahine v. Louisiana State University Medical Center in Shreveport, 28,691 (La.App.2d Cir.9/27/96), 680 So.2d 1352, writ denied, 96-2624 (La.12/13/96), 692 So.2d 1066. Such expert opinions are necessary sources of proof whose views are persuasive, although not controlling, and any weight assigned to their testimony by the jury is dependent upon the expert’s | [^qualifications and experience. Cox, supra; Davis v. Sonnier, 96-515 (La.App. 3rd Cir.11/6/96), 682 So.2d 910.
 In summary, if the record, when read in its entirety, supports the fact finder’s conclusions and those conclusions are reasonable, an appellate court cannot reverse or modify the trial court’s judgment which is based on those factual conclusions. An appellate court can only reverse a fact finder’s determinations when: (1) it finds from the record that a reasonable factual basis does not exist for the findings of the trial court, and (2) it further determines that the record establishes that the findings are manifestly erroneous. Stobart v. State through Department of Transportation and Development, 617 So.2d 880 (La.1993).

DISCUSSION

Mrs. Sensley argues that the record in this case does not support the jury’s finding that Glenwood did not breach the standard of care with respect to Donnie’s care. Specifically, Mrs. Sensley urges that the jury failed to consider the testimony of Dr. Einstein, who provided expert testimony on her behalf.
Dr. Einstein’s testimony is summarized as follows. Dr. Einstein testified that the most likely cause of Donnie’s death was airway obstruction and not a fat embolus. He further testified that, not long after Donnie entered the recovery room, Donnie became “hypoxic.” Hypoxia is a lack of oxygen to the brain, which can be caused by an airway obstruction. Lack of oxygen from such obstruction can cause brain death. Anesthesia increases the risk of airway obstruction, usually from relaxation of the tongue — which ^becomes the ob- *869 straction. Other airway tissues can also relax and create an obstruction. Dr. Einstein testified that Donnie was still under anesthesia when his endotracheal tube was removed and that, within a short time of the removal, he became critically ill. The most logical cause of this, according to Dr. Einstein, was an airway obstruction. Further, Dr. Einstein opined that Nurse Brown must have left Donnie unattended for some period and did not notice his deteriorating condition.
Dr. Einstein found it troubling that Donnie did not respond at all to Nurse Brown’s “jaw lift” which, according to Dr. Einstein, indicated that Donnie was still heavily anesthetized. He opined that Donnie was probably still paralyzed from the anesthesia and unable to breathe on his own when he left the operating room and Nurse Brown failed to recognize this. Despite his testimony that Donnie was likely paralyzed when he went into crisis, Dr. Einstein also testified that the pulmonary edema was “negative” edema, which occurs when a patient aggressively or strongly inhales against an airway obstruction and draws fluid down into the lungs.
Dr. Einstein further testified that a fat embolus is an extremely rare event and Dr. Thomas Grogan, an orthopedic surgeon who also testified on behalf of Mrs. Sensley, corroborated Dr. Einstein’s testimony in this regard. In Dr. Grogan’s opinion, it would be very unusual for a fat embolus to result from a hip pinning procedure; rather, according to Dr. Grogan, fat emboli are seen only in major trauma to the long bones or multiple broken bones.
In addition to the above-described testimony, the jury heard the testimony of Dr. Travis, the anesthesiologist attending Donnie’s postjsurgeryg care and testified on behalf of Glenwood. Dr. Travis acknowledged that it is a rare occurrence that usually presents in cases of trauma to large bones, but he consistently and decisively stated that it was his opinion that Donnie’s death was due to fat emboli. He stated his conclusion as follows:
Yes, I think the drilling with that nail in and out of the femur shaft, the femur shaft being in this case closed more or less acted as a piston to force the fatty cells * * * disrupted the fatty cells and forced the fatty tissue out and that fat accumulated either in the veins of the leg or lower abdomen and when he was moved to the stretcher that basically triggered it’s (sic) movement to the heart and to the lungs.
Significantly, Dr. Travis testified that people may suffer fat emboli that do not result in death; and, because there are no tests available to confirm this and there is no “cure,” the fat emboli go undiagnosed. The only confirmation of a fat embolus is found in pathology tests done on tissues of the deceased during autopsy.
Dr. Travis testified that Donnie’s rapid decline and specific symptoms caused him to initially consider the possibility of a pulmonary embolus (blood clot), with which Dr. Travis has had considerable experience. He testified that a pulmonary embolus and a fat embolus would produce similar symptomology. When Donnie began exhibiting pulmonary edema, however, Dr. Travis suspected a fat embolus. Pulmonary edema is a buildup of secretions in the lungs. He explained that edema results from the toxic nature of the fat, which causes damage to the lining of the blood vessels and lungs. Dr. Travis testified that they were constantly suctioning out fluid that was backing up into Donnie’s endotracheal tube from his lungs. He noted that the secretions should contain water and saliva, but he |flnoticed “a fatty substance floating on top of the secretions”; and, therefore, he collected a sample of the *870 secretions for testing. These tests revealed fat and fat cells. Dr. Travis farther testified that fat globules were detected in Donnie’s urinary catheter. According to Dr. Travis, both of these findings support the diagnosis of fat emoboli.
Dr. Travis also testified that a fat embo-lus could produce hypoxia and a drop in heart rate. He refuted Dr. Einstein’s theory of airway obstruction, describing how the air flowed freely into Donnie’s lungs when he used the ambu bag to assist in his breathing. Donnie was completely unresponsive to the breathing assistance. Dr. Travis stated that children are very resilient and respond very quickly to appropriate treatment, which means that, had Donnie had an obstructed or collapsed airway, he would have responded quickly to the breathing assistance. Instead, his heart rate continued to drop and his condition worsened.
As further refutation of the obstructed or collapsed airway theory, Dr. Travis noted that he re-intubated Donnie, or reinserted the endotracheal breathing tube, with no difficulty. After he was re-intu-bated, blood gas levels were drawn revealing that Donnie’s oxygen level was very low and that he was acidotic, which Dr. Travis opined to be consistent with a fat embolus. He explained that, as the fat clogs the arteries, it causes damage to the tissues and fluid develops in the lungs which interferes with the flow of oxygen into the blood vessels.
In addition, Dr. Travis testified that Donnie was not paralyzed from the anesthesia when his condition started to deteriorate. Donnie had been | inbreathing on his own by that time for approximately 30 minutes. On this point, the jury also heard the testimony of Nurse Gentry who testified that, at 2:08 p.m., when she transferred Donnie to Nurse Brown, there was no obstruction of Donnie’s airway and he was breathing on his own. She further testified that Donnie was not paralyzed, stating “you can’t be paralyzed and breathe.”
Finally, Dr. Travis disagreed with Dr. Einstein’s assertion that Donnie suffered from negative pulmonary edema, which occurs when a patient tries to breathe vigorously against the obstructed airway. He explained that this situation occurs when there are secretions present in the vocal chords and the vocal chords snap shut in a protective manner against the vigorous inhalations. If the patient is strong enough, this can actually draw the secretions from the vocal chords into the lungs. Dr. Travis stated that this was not the case with Donnie; rather, this type of edema is seen in young athletes because one has to be very strong to breathe in against your vocal chords hard enough to damage the lungs. Dr. Travis stated that “it takes a tremendous force to do that” and “generally the patient will be coughing and bucking and sit up and start fighting you” when they are creating negative pulmonary edema.
Next, Nurse Brown, a peri-anesthesia nurse,[1] testified on behalf of Glenwood and was qualified as an expert in the field of nursing. Nurse Brown corroborated Nurse Gentry’s testimony that Donnie’s condition was stable at 2:08 p.m. when he came into her care. She described Donnie’s | t 1 deterioration in detail during her testimony and stated that she never left him unattended between 2:08 p.m. and 2:15 p.m. when Dr. Travis arrived at Donnie’s bedside. Her testimony and her recorded notes indicate that Donnie was breathing on his own, his chest rising and falling, and *871 she could feel breath at his nose and mouth at 2:08 p.m., 2:10 p.m. and 2:12 p.m. At 2:14 p.m. she paged Dr. Travis and a respiratory therapist. Nurse Brown testified that there was no airway obstruction, stating “I know without a doubt there was no airway problem.”
Dr. McCormick also testified regarding his findings from the autopsy. His most significant finding was fat cells in the brain, lungs and kidneys, which led him to conclude that Donnie’s severe cerebral hypoxia was caused by fat emboli. He explained to the jury that he does “fat stains” to detect fat emboli in persons with trauma to long bones who have been fairly stable during a clinical course of treatment, but who suddenly become hypoxic and go into congestive heart failure. Dr. McCormick could not definitively say where the fat originated, but opined that it was either from cutting through the subcutaneous fat to get to the femur or from fat released from the marrow of the bone. He acknowledged that fat emboli can be caused by aggressive chest compressions during resuscitation where ribs are broken, but Dr. McCormick opined that this was not such a case because Donnie suffered no broken ribs.
Finally, Dr. Allen testified on behalf of Glenwood, confirming and restating the conclusion and reasons therefor of the Medical Review Panel. He testified that there was no breach of the standard of care in the actions of 1 ^Glenwood’s healthcare professionals involved in Donnie’s care. Dr. Allen specifically commented that he was impressed with Nurse Brown’s ability to care for the patient and keep detailed and complete notes of his condition during the crisis minutes.
Mrs. Sensley also argues that the hospital records of Donnie’s care were contaminated and unreliable. Specifically, she contends that the resuscitation record was completely rewritten. In addition, she claims that monitor sheets from the machines used in the recovery room were either discarded or lost and the “jot sheet,” a set of handwritten notes by a nurse, was “lost,” but was actually filed away in the hospital’s risk management office for six years. We find no merit in this argument. Nurse Brown testified regarding the hospital’s procedure in gathering all documentation, notations and monitor sheets and using those items to create a comprehensive record of the resuscitation events. This final resuscitation record was contained in the hospital records and was available to the jury.
After hearing and evaluating all of the above-described evidence, the jury accepted the testimony of Drs. Travis, Allen and McCormick and Nurses Gentry and Brown and found that there was no breach of the standard of care. There is ample testimony in this record to support this conclusion. The jury made credibility determinations regarding the experts who testified; and, granting these determinations great deference, we will not disturb them on appeal. This is indeed an extremely unfortunate and tragic case; however, finding the jury’s conclusion to be reasonable and supported by the record, we can find no manifest error in its verdict.
|13In addition, the jury was satisfied with the records introduced and the testimony of the healthcare professionals concerning the creation of the records and procedures followed during the resuscitation efforts in this case. We find no manifest error in this regard.

CONCLUSION

For the foregoing reasons, the judgment in favor of Glenwood Regional Medical *872 Center is affirmed. Costs are assessed to Plaintiff/Appellant, Debra Sensley.
AFFIRMED.

. Nurse Brown testified that a peri-anesthesia nurse is one who works primarily with preoperative, intra-operative and post-operative anesthesia patients.